Lionel POOLAW, and Daphne Poolaw, as next friends of Lionel B. Poolaw III, Minor Child, Plaintiff–Appellant,

v.

Diane BISHOP, Superintendent of Public Instruction; Arizona Department of Education, Parker United School District No. 27; and Parker Unified School District, Defendants–Appellees.

No. 94–15324.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 15, 1995.

Decided Oct. 4, 1995.

Randolph H. Barnhouse, Native American Protection and Advocacy Project, Window Rock, Arizona, for plaintiff-appellant.

Eva K. Bacal, Assistant Attorney General, Phoenix, Arizona, and Richard M. Yetwin, DeConcini, McDonald, Brammer, Yetwin & Lacy, Tucson, Arizona, for defendants-appellees.

Before HUG, FARRIS, and POOLE, Circuit Judges.

## OPINION

HUG, Circuit Judge:

The issue presented in this case is whether the district court erred in finding that Lionel B. Poolaw III, a profoundly deaf Native American child, could not receive an appropriate education in a mainstream school environment. The district court granted summary judgment in favor of the Parker Unified School District and the Arizona Superintendent of Public Instruction in an action brought by Lionel's parents under the Individuals with Disabilities Education Act ("IDEA") challenging the Superintendent's decision to place Lionel in a school for the deaf located 280 miles from his home. We affirm.

## BACKGROUND

Lionel Poolaw is a thirteen-year-old Native American boy who is profoundly deaf. In 1985, when Lionel was four years old, his parents sought to enroll him in school. At that time Lionel resided on the Colorado River Indian Reservation in Arizona, part of the Parker Unified School District ("Parker"). He was enrolled in the Head Start preschool program in Parker. At Parker's request, Heidi Gray, a certified teacher of the hearing impaired, evaluated Lionel. Based on her review of his academic record, her observation of Lionel, and interviews with his parents and his teacher, she found that Lionel's receptive and expressive language skills were delayed by about two years, that he was nonverbal and had a very

limited sign vocabulary, and that his language-based areas of cognitive and social skills also were delayed. She recommended intensive language instruction, speech therapy and sign language instruction for the family. Peggy Kile, the Parent Outreach Program Coordinator for the Arizona School for the Deaf and Blind ("ASDB"), recommended residential placement at ASDB because Lionel's profound hearing loss would probably preclude effective functioning in a public school classroom. Lionel's parents refused to place Lionel at ASDB.

Shortly thereafter, the family moved to Baton Rouge, Louisiana, where Lionel was placed in a mainstream education environment. Neither party produced records documenting Lionel's education in Louisiana.

During this time, Lionel's parents became ordained ministers. In pursuit of their calling, the Poolaws moved from Baton Rouge to establish a ministry in Fredonia, Arizona. Mrs. Poolaw testified that Lionel was the first hearing impaired child in the school district in Fredonia, that she was hired by the school to serve as his interpreter, and that she provided the only language training Lionel received in Fredonia. The Parker School District received some records from Fredonia Elementary School. Loretta Nelson, a special education teacher, wrote that Lionel attended only the first grade at the school and that he spent time in the regular classroom and in a special education class. The Individualized Education Program ("IEP") developed for Lionel in Fredonia noted that he was expressing only one to three words at a time and had very little spontaneous language.[1]

Lionel attended first grade in Fredonia, but in 1988, when Lionel was eight years old, the family moved to Plummer, Idaho, to start another church. The Poolaws lived in Plummer for four years and Lionel attended Plummer Elementary School from second through fifth grades.

The Plummer Elementary School District in Idaho developed and implemented an IEP for Lionel during his first year in that district. The IEP recommended partially mainstreaming Lionel while also providing supple-

---

1. The IDEA requires the school district to establish "an individualized education program for each child with a disability" at the beginning of each school year. 20 U.S.C. § 1414(a)(5).

mental services, including a speech therapist twice a week, a full-time interpreter, and weekly sessions with a teacher for the hearing impaired. Lionel's IEPs from 1988–90 showed Lionel consistently lagging behind his peers in his language and communicative skills.

In 1991, when Lionel was ten years old, Plummer conducted its 3–year review of Lionel's IEP. The evaluation found that Lionel's reading skills were only at the first grade level and that his math skills were at the second grade level. The evaluation further found that Lionel's language and communication skills were "nearly nonexistent without help." Lionel's 1991 IEP recommended additional supplemental services including one-on-one and small group instruction, individual resource support, a full-time interpreter and approximately 18 hours per week in the regular classroom. Unfortunately, the 1991 IEP did not significantly improve Lionel's performance and, in the spring of 1992, Plummer revised its IEP and recommended placing Lionel in the Idaho State School for the Deaf and Blind for the following school year. Lionel's parents initially agreed to place him at the special school, but never actually signed the IEP.

Prior to the end of the 1991–92 school year, Lionel's parents moved from Idaho back to Arizona. The Poolaws sought to enroll Lionel at Wallace Elementary School in the Parker School District for the 1992–93 school year. The Poolaws indicated to Arthur Sirianni, Parker's Special Education Coordinator, that they would prefer Lionel to be mainstreamed at Parker. Sirianni initially began searching for a certified teacher of the hearing impaired to assist Lionel in the mainstream environment. After reviewing Lionel's IEP and reports from Idaho, however, Sirianni determined that mainstreaming Lionel would not result in any educational benefit to him. As part of the two-person IEP team in the Parker School District, Sirianni proposed that Lionel be sent to the Arizona School for the Deaf and Blind. This proposal was presented to Lionel's parents at an IEP meeting held on July 23, 1992. The Poolaws refused to have Lionel placed at the ASDB. The School District then initiated an impartial hearing pursuant to the IDEA and 34 C.F.R. § 300.506. The hearing officer concluded that Lionel should be placed at the ASDB. The Poolaws appealed to the Arizona Department of Education pursuant to 20 U.S.C. § 1415(b)(2). The appellate hearing officer upheld the hearing officer's decision. The Poolaws then filed a complaint in federal district court challenging these decisions.

The Parker School District moved for summary judgment on June 2, 1993. The district court held a 2–day evidentiary hearing pursuant to 20 U.S.C. § 1415(e)(2) on July 27 and 28, 1993. The court also convened at the ASDB on August 27, 1993. On September 17, 1993, it held further proceedings at Marcos de Niza High School in Tempe, Arizona, and at the Phoenix Day School for the Deaf, two other schools considered as possible placements for Lionel. On January 7, 1994, the district court entered its thorough and carefully reasoned 44–page findings of fact, conclusions of law and order. The district court concluded that the appropriate placement for Lionel was the ASDB and affirmed the decision of the hearing officer. The district court further ordered that "as previously stipulated, Parker will arrange to provide the Poolaw family with a monthly travel allowance to facilitate visits to ASDB." The Poolaws then filed the present appeal. The appeal was timely and we have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

The appropriateness of a special education placement under the IDEA is reviewed *de novo.* *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23,* 960 F.2d 1479, 1483 (9th Cir.1992). A district court's factual determination that a student is incapable of deriving educational benefit unless placed in a residential program, however, is reviewed for clear error. *Sacramento City Unified Sch. Dist. v. Rachel H.,* 14 F.3d 1398, 1402 (9th Cir.), *cert. denied,* 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994) (citing *Ash v. Lake Oswego Sch. Dist.,* 980 F.2d 585, 588 (9th Cir.1992)). The Poolaws bear the burden of proving that the state educational agency did not comply with the IDEA. *See Clyde K. v. Puyallup Sch. Dist., No. 3,* 35 F.3d 1396, 1398–99 (9th Cir.1994) (allocating burden in district court to party challenging state educational agency's decision).

## DISCUSSION

■ The IDEA, 20 U.S.C. §§ 1400 et seq., requires states receiving federal assistance for the education of disabled children to establish "procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped." 20 U.S.C. § 1412(5)(B). The language of the IDEA, therefore, clearly indicates a strong preference for "mainstreaming," i.e., educating handicapped children alongside non-handicapped children in a regular educational environment. In carrying out this directive, the state educational agency must develop and implement an IEP aimed at providing each disabled child with a "free appropriate public education," 20 U.S.C. § 1412(1), in the least restrictive environment. 34 C.F.R. § 300.550 et seq. Likewise, the state educational agency must ensure that private schools and facilities develop and implement IEPs for disabled children who are placed in or referred to private schools or facilities by public agencies. *Id.* at § 300.341(b). These plans must be "designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley,* 458 U.S. 176, 188–89, 102 S.Ct. 3034, 3041–42, 73 L.Ed.2d 690 (1982).

The IDEA's broad mandate to provide handicapped children with a free appropriate public education designed to meet the unique needs of each handicapped child is fairly imprecise in its mechanics. This vagueness reflects Congress' clear intent to leave educational policy making to state and local education officials. *See Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051; *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1044 (5th Cir.1989). School officials therefore retain maximum flexibility to tailor education programs as closely as possible to the needs of each handicapped child.

The IDEA does, however, require each state to ensure that handicapped children are educated alongside non-handicapped children to the maximum extent appropriate.[2] This requirement creates a natural tension within the IDEA as state educators try to establish appropriate educational programs for handicapped children to meet their unique needs while attempting to comply with the IDEA's clear preference for mainstreaming. In some cases, such as where the child's handicap is particularly severe, it will be impossible to provide any meaningful education to the student in a mainstream environment. In these situations continued mainstreaming would be inappropriate and educators may recommend placing the child in a special education environment. This allows educators to comply with the Act's main requirement—that the child receive a free appropriate public education. Thus, "the Act's mandate for a free appropriate public education qualifies and limits its mandate for education in the regular classroom." *Daniel R.R.,* 874 F.2d at 1045.

■ The IDEA itself does not provide any guidance in determining when its mainstreaming requirement has been met. The Supreme Court, however, has provided general guidance for deciding whether a state educational agency has complied with the requirements of the IDEA. *Rowley,* 458 U.S. at 206–07, 102 S.Ct. at 3050–51. Under *Rowley,* the reviewing court must engage in a two-part inquiry. First, we must examine whether the state has complied with the procedures set forth in the IDEA and its regulations. Second, we must determine whether the IEP developed through these procedures is "reasonably calculated to enable the child to receive educational benefits." *Id.*

### I. PROCEDURAL COMPLIANCE

The Poolaws contend that the Parker School District has not complied with the IDEA's procedural requirements in three respects. First, they argue that Parker has failed to provide a continuum of alternative

---

2. 20 U.S.C. § 1412(5)(B) requires states to establish:

   procedures to assure that, to the maximum extent appropriate, handicapped children ... are educated with children who are not handicapped, and that special classes, separate

schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

placements as required by 34 C.F.R. § 300.551. Second, they argue that the School District has failed to mainstream Lionel to the maximum extent appropriate as required by 20 U.S.C. § 1412(5)(B). Finally, they argue that the School District has failed to ensure that Lionel's educational placement is as close to his home as possible as required by 34 C.F.R. § 300.552(a)(3).

### A. Continuum of Alternative Placements

The school district relied in part on the reports of Lionel's educational history in Idaho to conclude that further mainstreaming would not benefit Lionel educationally. The Poolaws contend that this violates the IDEA because that Act requires each school to implement its own programs to mainstream a child to the maximum extent appropriate before deciding to place him in a special education classroom. The Poolaws correctly point out that the IDEA requires school officials to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551(a). The Poolaws argue that Parker's reliance on the Idaho reports was improper because, in effect, Parker only considered the residential placement option rather than a number of alternative programs that could be implemented at Parker. We find these contentions to be unpersuasive.

The district court concluded that the IDEA does not necessarily require a school district actually to implement supplemental services before choosing an alternative to mainstreaming. We agree with this conclusion. The IDEA requires schools to give serious consideration to including handicapped children in the regular classroom. See, e.g., Oberti v. Board of Educ. of the Borough of Clementon Sch. Dist., 995 F.2d 1204, 1216 (3d Cir.1993); Daniel R.R., 874 F.2d at 1048 (holding that the "Act does not permit states to make mere token gestures to accommodate handicapped students"). The term "serious consideration," however, does not mean that a state educational agency must necessarily implement its own alternative placements in every case.

A school district may, without running afoul of the IDEA, rely upon the reports of another school district when developing its own IEP for a handicapped child as long as the information relied upon is still relevant. In this case, there is no indication that the procedures used by the Plummer School District in Idaho violated the IDEA. Further, the reports covered Lionel's educational progress continuously from 1988 through the end of the 1991–92 school year. The Parker School District in Arizona relied upon these reports to assist in developing its own IEP for the 1992–93 school year. There was no evidence that Lionel's situation had changed in the few months following the last Idaho report and the date Lionel sought enrollment in the Parker School District.

Considering the programs instituted by other school districts and the fruits of those programs allows a state educational agency to make an informed evaluation of the likelihood of success of mainstreaming when developing its own IEP for a handicapped child. Nothing in the IDEA requires a state to repeat a course of action that will not result in educational benefit to the handicapped child. Therefore, we conclude that the Parker School District's reliance on the Idaho IEPs and reports to assist in developing its own IEP for Lionel was permissible under the IDEA.

As previously noted, the IDEA requires school officials to "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.551(a). The record indicates that the Plummer School District in Idaho complied with this requirement. Plummer offered a variety of supplemental aids and services, coupled with varying degrees of placement in the regular classroom to mainstream Lionel to the maximum extent appropriate. These services included access to resource rooms, individual and group instruction, a full-time interpreter, and weekly instruction in American Sign Language ("ASL"). No combination of these supplemental aids and services resulted in significant improvement in Lionel's academic and communicative skills. We hold that the Parker School District properly relied on the various IEPs provided by the Plummer School District in Idaho and the alternative placements provided by that school district.

Because the record indicates that the Plummer School District provided an adequate continuum of alternative placements and that the Idaho IEPs and reports were considered by Arthur Sirianni in making his recommendation for the Parker School District, we conclude that this procedural requirement of the IDEA has been met.

### B. Mainstreaming to the Maximum Extent Appropriate

■ The question whether to educate a handicapped child in the regular classroom or to place him in a special education environment is necessarily an individualized, fact specific inquiry. In each case, the apparent tension between the IDEA's clear preference for mainstreaming and its requirements that schools provide individualized programs tailored to the specific needs of each disabled child must be balanced. 20 U.S.C. §§ 1401, 1414(a)(5); see also Oberti, 995 F.2d at 1214; Daniel R.R., 874 F.2d at 1044–45.

Recently, we discussed four factors to help determine whether a school's decision to remove a child with disabilities from the regular classroom and place him in a special education environment violates the IDEA. In Rachel H., we held that a court should consider: (1) the educational benefits of full-time placement in the regular classroom; (2) the nonacademic benefits of such placement; (3) the effect the disabled child has on the teacher and children in the regular class; and (4) the costs of mainstreaming the child. Rachel H., 14 F.3d at 1404.

### i. Educational Benefits of Mainstreaming

■ The IDEA's preference for mainstreaming is not an absolute commandment. The language of 20 U.S.C. § 1412(5)(B) only requires mainstreaming "to the maximum extent appropriate" and provides that "when the nature or severity of the handicap is such that education and regular classes with the use of supplementary aids and services cannot be achieved satisfactorily" the student may be removed to a special education environment. In this case all parties agree that Lionel's disability has created a great deficit in his ability to communicate with and understand others. Because Lionel is at a critical stage for developing these communicative skills, the district court found that he requires immediate intensive instruction in ASL so he may comprehend and understand the instruction being offered in the regular classroom.

In reviewing the Parker School District's decision to place Lionel at ASDB, the district court conducted an evidentiary hearing to determine the extent to which Lionel could be mainstreamed. The district court determined that because of its size and location, the Parker School District could not provide the degree of intensive ASL instruction that Lionel needs and concluded that Lionel should be placed at ASDB, the nearest facility capable of providing the requisite instruction. The court reviewed Lionel's history of mainstreaming in Idaho and heard testimony from expert witnesses as to the likely success of continued mainstreaming. The court also considered other factors including the location of the suggested placement 280 miles from home, the value of social interaction with Lionel's nondisabled friends and the influence of his Native American tribe. The district court's finding that Lionel cannot presently receive any educational benefit from full or partial mainstreaming until he has acquired greater communication skills is not clearly erroneous. It is worth noting, however, that the IDEA requires the state educational agency to update Lionel's IEP annually. Should it become apparent that his communicative skills have increased to the point that he could receive educational benefits from mainstreaming, then the IDEA requires that Lionel be placed in that environment.

### ii. Nonacademic Benefits of Mainstreaming

The record reflects that Lionel could receive some nonacademic benefits from continued mainstreaming. He apparently has a number of friends at his school and enjoys some social interaction with them. He would remain close to his mother and father and his Native American Indian tribe. Although these considerations are very important, the IDEA is primarily concerned with the long term educational welfare of disabled students. It is clear that Lionel's manner of communication with others is very primitive.

The evidence reveals that with a more developed ability to communicate, his social interaction skills will mature and he will be able to fully enjoy and appreciate the relationships with his friends, family and tribe.

### iii. *Detrimental Impact on Classroom and Teacher*

Both parties agree that Lionel is of above-average intelligence and would not detrimentally affect the classroom environment were he to be mainstreamed. This is not an adverse factor to mainstreaming in this case. The major concern here is what will be the best educational program for Lionel, not any detrimental impact on the teacher or other students. As we have discussed, Lionel will receive no educational benefits from instruction in the regular classroom until he acquires greater communicative skills.

### iv. *Cost*

We must consider the costs of mainstreaming in light of Lionel's educational needs. As discussed above, Lionel requires intensive ASL instruction in a "total immersion" environment. Because of its size and location, the Parker School District is unable to provide such an environment in a mainstream setting but is willing to expend the costs of such a total immersion at the ASDB.

### C. *Placement as close as possible to home*

■ The Poolaws argue that the Parker School District's suggested placement for Lionel at ASDB violates 34 C.F.R. § 300.552(a)(3) because ASDB is located 280 miles from Lionel's home. As previously discussed, the district court concluded that Lionel requires intensive instruction in ASL in an environment of total immersion in that language. The district court received evidence from both parties as to whether the Parker School district could provide these services. The district court found that because of its size and location, the Parker School District was unable to provide the resources necessary to fulfill Lionel's needs. This finding is adequately supported by the record and we conclude that it is not clearly erroneous. Because ASDB is the closest facility equipped to provide Lionel with the total immersion services he requires, his placement at that school is as close as possible to home. This does not violate 34 C.F.R. § 300.552(a)(3).

Upon the foregoing analysis, we conclude that the Parker School District did not violate the IDEA's procedural requirements. The district court's finding that Lionel cannot presently receive educational benefit from continued mainstreaming is adequately supported by the record. We therefore affirm the decision of the district court on this issue.

### II. *Adequacy of Lionel's Current IEP*

■ The second inquiry in determining whether a state educational agency has complied with the IDEA is directed to the adequacy of the IEP developed for the disabled child. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051–52. To comply with the IDEA, the IEP must be reasonably calculated to enable the disabled child to receive educational benefits. *Id.*

Based upon Lionel's educational history in Idaho and the expert testimony received at the evidentiary hearing, the district court concluded that Lionel required intensive ASL training in a total immersion environment. The court found that Lionel is at a critical stage for developing communicative skills. The court adopted expert testimony to the effect that after age 15, there is a diminishing desire and capacity to acquire new language skills. Therefore, the court concluded, Lionel requires immediate and intensive instruction in ASL. The IEP developed by the Parker School District would place Lionel in such an environment. The Arizona School for the Deaf and Blind provides intensive ASL instruction that will be constantly reinforced by instructors and peers with whom Lionel will interact throughout the day. Through such a program Lionel can hope to acquire the language skills required to receive educational benefits from the mainstream classroom environment and to communicate effectively with friends and family outside of the classroom. We therefore conclude that Lionel's current IEP is reasonably calculated to result in educational benefit to Lionel.

### CONCLUSION

The district court's finding that Lionel will receive no educational benefit from continued

mainstreaming is not clearly erroneous. The IDEA only requires a state educational agency to mainstream a disabled student to the maximum extent appropriate. It would be inappropriate to mainstream a child when he can receive no educational benefit from such a policy. We conclude that the Parker School District complied with the IDEA's mainstreaming preference and other procedural requirements. Because Lionel's current IEP is reasonably calculated to result in educational benefit to him, the Parker School District did not violate the IDEA by concluding that Lionel be placed in a special education environment.

Accordingly, the order of the district court is **AFFIRMED.**