**CHELTENHAM SCHOOL DISTRICT, Plaintiff,**

v.

**JOEL P., a minor, by his parents and next friends, SUZANNE P. and Robert P., Suzanne P., individually and on her own behalf, and Robert P., Defendants.**

**Civil Action No. 96–3992.**

United States District Court, E.D. Pennsylvania.

Dec. 24, 1996.

Kenneth A. Roos, Blue Bell, PA, for Plaintiff.

Victor Paul Goldberg, Melrose Park, PA, for Defendants.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Cheltenham School District ("Cheltenham") brought this action against Defendants Joel P. ("Joel"), a minor, and Suzanne P. and Robert P., Joel's parents, under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. §§ 1400–1491o (West 1990 & Supp.1996). Cheltenham seeks review under § 1415(e)(2) of a decision by the Special Education Due Process Appeals Review Panel of Pennsylvania ("Appeals Panel"), an administrative tribunal, in which the Appeals Panel ruled that Cheltenham must provide a special education Life Skills Support program for Joel within the Cheltenham school district. Cheltenham asks me to vacate the Appeals Panel's decision and reinstate the order of Special Education Hearing Officer Vernard M.W. Trent ("Hearing Officer Trent"), which approved placement of Joel in a Life Skills Support program but which did not identify any particular location for the placement. Cheltenham seeks to place Joel in an existing Life Skills Support program located in a nearby school district, rather than to create such a program within its own school district. Defendants ask me to affirm the decision of the Appeals Panel and require Cheltenham to create a Life Skills Support program for Joel within its own district.

The IDEA provides a parent of a child with disabilities "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C.A. § 1415(b)(1)(E) (West 1990). Any parent making such a complaint must "have an opportunity for an impartial due process hearing" before a designated state educational agency. 20 U.S.C.A. § 1415(b)(2) (West 1990). The IDEA allows states to adopt a two-tiered level of agency review, § 1415(b)(2), (c), which Pennsylvania has done. "Any party aggrieved by the findings and decision" made by the state educational agency conducting or reviewing the due process hearing may bring a civil action in any competent state court or in federal court. 20 U.S.C.A. § 1415(e)(2) (West 1990).

In reviewing the decision of the state educational agency (the Appeals Panel here), a district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(e)(2). The Supreme Court has explained that § 1415(e)(2) allows a court to make " 'independent decision[s] based on a preponderance of the evidence,' " *Board of Educ. v. Rowley*, 458 U.S. 176, 205, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982) (alteration in original) (quoting S.Conf.Rep. No. 455, 94th Cong., 1st Sess. 50 (1975), *reprinted in* 1975 U.S.C.C.A.N. 1480, 1503), but that in arriving at an independent decision, a court must give "due weight" to the administrative proceedings being reviewed, *id.* at 206, 102

S.Ct. at 3051. Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* Although the court must consider the administrative proceedings and give them due weight, it "is free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act." *Oberti v. Board of Educ.,* 995 F.2d 1204, 1220 (3d Cir.1993).

Although I am reviewing the decision of the Appeals Panel and thus must give its findings due weight, I note that the issue involved in this action differs from the issue involved in the administrative proceedings. In the administrative proceedings, the question was whether Joel should be placed in a Life Skills Support program or remain in the Learning Support program that he is currently placed in. A review of the administrative record reveals no indication that the parties argued about the geographical location of the Life Skills Support program before Hearing Officer Trent or the Appeals Panel, nor have the parties shown me any evidence that geographical location was specifically at issue in the administrative proceedings. It appears that the Appeals Panel raised the issue *sua sponte* in ordering Cheltenham to provide the Life Skills Support program in its own district. Cheltenham appealed solely that portion of the Appeals Panel's ruling concerning the geographical location of the placement, and the parties have limited their arguments in this proceeding to that issue.[1] For purposes of this appeal, both parties accept the decisions of Hearing Officer Trent and the Appeals Panel that Joel's appropriate placement is in a Life Skills Support program. Thus, much of the evidence pertinent to the resolution of this case has been presented for the first time in these judicial proceedings.

After consideration of the records from the administrative proceedings, presentation of

additional evidence by both parties at a bench trial held on December 17, 1996, and the parties' pretrial and trial memoranda, I make the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Joel is a nine-year-old child who was born on March 20, 1987 and who has Down's Syndrome. Pl.'s Ex. 2, at 682; Pl.'s Ex. 3, at 689; Pl.'s Ex. 5, at 698.

2. Joel resides in the Cheltenham School District and currently attends Wyncote Elementary School in the District. Pl.'s Ex. 3, at 689.

3. Joel has been placed in a special education Learning Support program since first grade.[2] Pl.'s Ex. 2, at 682; Pl.'s Ex. 3, at 689.

4. Joel is now in his fourth year with the Cheltenham School District, which would chronologically place him in the fourth grade, although he is not actually placed in a grade in the Learning Support program. Testimony of Carol Giersch, Local Education Agency Representative (Special Education), December 17, 1996.

5. At a meeting held on June 13, 1995, in which Alice W. Johnson, Ed.D., Director of Pupil Services; Ken Roos, Esq., attorney for Cheltenham; Carol Giersch, L.E.A. Representative; Paul Ferrer, Ed.D., Psychologist; Karen Tecosky, Joel's Teacher; Catherine Feskanin, Language Therapist; Elaine Hrynko, School Nurse; Robert Prince, Joel's parent; and Robin M. Torrence, MH/MR Case Manager participated, an Individualized Education Program ("IEP") was proposed in which Joel would be placed in a Life Skills Support program, a different special education program than the Learning Support program he was currently enrolled in. Pl.'s Ex. 5, at 698–706.

6. Cheltenham does not operate a Life Skills Support program within its own dis-

---

1. Defendants explicitly stated on the record at the trial held on December 17, 1996 that they were not challenging the determination that the Life Skills Support program was an appropriate placement for Joel.

2. Joel has remained in the Learning Support program placement at Wyncote Elementary School during the pendency of the administrative and judicial proceedings pursuant to 20 U.S.C.A. § 1415(e)(3)(A) (West Supp.1996).

trict. Pl.'s Ex. 2, at 9; Testimony of Charles Stefanski, Superintendent of Cheltenham, December 17, 1996.

7. By a separate letter dated June 20, 1995, Alice W. Johnson, Ed.D., Director of Pupil Services, informed Suzanne P. that the IEP team recommended placing Joel in a full-time Life Skills Support program in a neighboring school district. Copies of the proposed IEP and Notice of Recommended Assignment ("NORA") were enclosed, and Suzanne P. was asked to indicate on the NORA her approval or disapproval of the IEP. Pl.'s Ex. 35, at 842; Pl.'s Ex. 36, at 843; Pl.'s Ex. 4, at 696–97.

8. Suzanne P. signed the NORA on July 1, 1995, and indicated that she disapproved the proposed IEP and requested a due process hearing. Pl.'s Ex. 4, at 697.

9. By a letter dated June 30, 1995, Thomas S. Simek, Ed.D., Program Supervisor for the Montgomery County Intermediate Unit ("MCIU"), informed Carol Giersch, L.E.A. Representative, that the MCIU would accept Cheltenham's referral of Joel to the MCIU for placement. Pl.'s Ex. 25, at 815.

10. By a letter dated July 27, 1995, Carol Giersch, L.E.A. Representative, sent Suzanne P. a program description of a Life Skills Support class operated by the MCIU at Fitzwater Elementary School in the Upper Dublin School District. Pl.'s Ex. 28, at 819–32.

11. Pursuant to Suzanne P.'s request for a due process hearing, hearings were held before Hearing Officer Trent on August 31, 1995, September 20, 1995, October 30, 1995, December 18, 1995, and February 26, 1996. Pl.'s Ex. 2, at 681–82.

12. By decision of March 10, 1996, Hearing Officer Trent determined that the appropriate placement for Joel was the "Life Skills Support Program offered by the District in the June 1995 IEP." Pl.'s Ex. 2, at 685–88.

13. On March 25, 1996, Suzanne P. appealed the decision of Hearing Officer Trent. She requested the Appeals Panel to reverse Hearing Officer Trent's decision and order Cheltenham to place Joel in a public or private Learning Support program. Pl.'s Ex. 3, at 691.

14. By decision of April 28, 1996, the Appeals Panel of Pennsylvania affirmed the decision of Hearing Officer Trent insofar as it ordered that the appropriate placement for Joel was the Life Skills Support program, but the Appeals Panel modified Hearing Officer Trent's decision by ordering Cheltenham to provide the Life Skills Support program within its own district rather than send Joel to an existing program operated by the MCIU in another school district. Pl.'s Ex. 3, at 693–94.

15. On May 29, 1996, Cheltenham filed this action to appeal the decision of the Appeals Panel solely with respect to the order that Cheltenham provide the Life Skills Support program within its own district and requested that I reinstate the order of Hearing Officer Trent. Compl. at 6.

16. All of the elementary schools (kindergarten through fourth grade) in the Cheltenham School District, including Wyncote Elementary School, which Joel currently attends, are fully occupied. Thus, to provide a Life Skills Support program for Joel within the District, Cheltenham would have to build a new classroom to accommodate the program (or in which to relocate another class if the program is placed in an existing classroom). Testimony of Charles Stefanski, Superintendent of Cheltenham, December 17, 1996.

17. The cost of constructing a portable classroom and connecting the portable classroom to the school, based on past recent experience in purchasing and connecting a portable classroom, would likely exceed $50,000. Testimony of Stephen Saile, Director of Support Services of Cheltenham, December 17, 1996; Pl.'s Ex. 43.

18. To provide the Life Skills Support program within the Cheltenham school district, Cheltenham would have to hire a new teacher. Under the collective bargaining agreement currently in effect between Cheltenham and the Cheltenham Educators' Association PSEA/NEA, the salary range for a teacher in the 1996–97 school year is $35,000 to $77,554. The minimum salary for a teacher with 12 years of experience, the amount of experience possessed by the current teacher

of the Life Skills Support program that Joel would attend if he were placed in the program operated by the MCIU, is $66,430. Testimony of Charles Stefanski, Superintendent of Cheltenham, December 17, 1996; Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996; Pl.'s Ex. 44, at 24.

19. In addition to salary, Cheltenham would have to pay a new teacher benefits in an amount equal to approximately twenty-five to thirty percent of the base salary. Testimony of Charles Stefanski, Superintendent of Cheltenham, December 17, 1996.

20. To provide the Life Skills Support program within the Cheltenham school district, Cheltenham would have to hire a new teacher's aide, unless the teacher's aide currently assisting Joel's teacher at Wyncote Elementary School has no other duties besides attending to Joel's education that would prevent relocation to a Life Skills Support program. Under the collective bargaining agreement currently in effect between Cheltenham and the Business Employees' Council ESPA/PSEA/NEA, the hourly rate for a teacher's aide as of July 1, 1996 ranges between $8.71 and $10.88, and the estimated annual cost for a teacher's aide is approximately $10,000. Testimony of Charles Stefanski, Superintendent of Cheltenham, December 17, 1996; Pl.'s Ex. 45, at 6.

21. The annual tuition that Cheltenham pays to place a child in the Life Skills Support program operated by the MCIU is $14,529. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

22. Three other students residing in the Cheltenham school district are placed in a Life Skills Support program. The three students are currently six, seven, and nine years old, respectively. Only the nine-year-old child is age-appropriate to share a Life Skills Support program with Joel. Testimony of James Scagliotti, Director of Pupil Services of Cheltenham, December 17, 1996.

23. The MCIU operates five Life Skills Support programs. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

24. The program appropriate for a child of Joel's age is located in the Crooked Billet Elementary School in the Hatboro–Horsham School District. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

25. The Crooked Billet Elementary School is located approximately ten miles away from the Cheltenham Township. Testimony of Carol Giersch, Local Education Agency Representative (Special Education), December 17, 1996.

26. The Crooked Billet Elementary School is the location closest to Joel's residence at which a Life Skills Support program is offered. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

27. Eleven students are currently enrolled in the Life Skills Support program at Crooked Billet Elementary School (the "Billet IU program"). Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

28. The Billet IU program is taught by two full-time teachers, one who has worked for the MCIU for twelve years, and several part-time staff. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

29. The teachers and staff members from all of the various MCIU special education programs participate in three full-day in-service workshops at the beginning of each school year. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

30. Related services offered with the Billet IU program include the provision of a social services worker who acts as a liaison between the student's family and the various community agencies, an adaptive physical education program, community-based programs (field trips), and a behavior management program. Cheltenham does not currently provide any of these services. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996; Testimony of James Scagliotti, Director of Pupil Services of Cheltenham, December 17, 1996; Pl.'s Ex. 28, at 829.

31. The Billet IU program is located in a first-floor classroom in a regular elementary school, close to the cafeteria, with direct access to the playground and school bus unloading area. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

32. The students in the Billet IU program have an opportunity to play with nondisabled children on the playground during recess. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

33. The students in the Billet IU program are assigned to a home room in a regular classroom. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

34. The students in the Billet IU program are paired with a "buddy," a nondisabled child in the fifth grade, who generally visits the student in the IU program classroom for a half-hour each day and who sometimes joins the student for lunch in the lunchroom. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

35. The students in the Billet IU program eat lunch in the regular lunchroom, although they do sit by class, as do all classes in the Crooked Billet Elementary School. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

36. If the IEP of a student in the Billet IU program permits, the student may be placed in a regular classroom for particular subjects, such as music, art, gym, or academic classes appropriate for the student's skill level. Testimony of Thomas Simek, Supervisor of Special Education, MCIU, December 17, 1996.

### CONCLUSIONS OF LAW

The Billet IU program can accommodate the mainstreaming goals set forth in Joel's current or future IEPs to the same extent that Wyncote Elementary School can. As a student in the Billet IU program, and if his IEP permits, Joel could be integrated with nondisabled students at lunch, at recess, through the "buddy" program, and by assignment to a regular home room and to regular music, art, gym, or appropriate skill-level academic classes. Thus, placement in the Billet IU program would not place Joel in a more restrictive learning environment because he will have the same mainstreaming opportunities as he would have at Wyncote Elementary School.

■ The IDEA and accompanying regulations do not require Cheltenham to create the Life Skills Support program within its own school district. The federal regulations require that a disabled child be "educated in the school that he or she would attend if nondisabled" only if the child's IEP does not "require[ ] some other arrangement" and that generally the child should be placed "as close as possible to the child's home." *See* 34 C.F.R. § 300.552(a)(3), (c) (1996). The accompanying notes cite as "pertinent to this section" portions of analysis accompanying the regulations for Section 504 of the Rehabilitation Act of 1973, which provide that "among the factors to be considered in placing a child is the need to place the child as close to home as possible" and which explain that "[a]n equally appropriate education program may exist closer to home." 34 C.F.R. § 300.552 note.

Although the regulations do signal a preference that the child be located in the school he would attend if nondisabled, they explicitly contemplate that the child's IEP may require "some other arrangement," and rather than mandating placement in the child's neighborhood school, they require only that the child be placed as close "as possible" to the child's home. Likewise, although the accompanying commentary certainly identifies geographical proximity as a factor to be considered in placing a child, it also explicitly acknowledges that geographical proximity is "among the factors" to be considered and thus that it is only one of several factors that must be weighed in deciding where to place the child. Moreover, the commentary notes only that an appropriate program may "exist" closer to home, rather than observing that a nonexisting program could be created closer to home. Thus, the regulations and commentary identify geographical proximity

as a consideration, but not a mandatory requirement, in placing a disabled child.

■ This reading of the regulations and commentary is consistent with the caselaw. The Third Circuit recently explained that the federal regulations create a "presumption in favor of placing the child, if possible, in the neighborhood school," but that "if that is not feasible," the child should be placed "as close to home as possible," and it cited as authority *Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146 (4th Cir.) (per curiam), *cert. denied*, 502 U.S. 859, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991). *See Oberti v. Board of Educ.*, 995 F.2d 1204, 1224 n. 31 (3d Cir. 1993). In *Barnett*, the Fourth Circuit interpreted the regulations and commentary to mean that geographical proximity is not an "absolute obligation," but "one factor" that a school district must take into account when placing a disabled child. *See Barnett*, 927 F.2d at 153. Another factor that the school district may take into account is the impact a proposed placement would have on limited educational and financial resources. *See id.* at 154. The Fourth Circuit cited the requirement under 20 U.S.C. § 1412(3) that the states set priorities in the provision of free appropriate public education as evidence that "Congress intended the states to balance the competing interests of economic necessity, on the one hand, and the special needs of a handicapped child, on the other, when making education placement decisions." *Id.* Although financial considerations certainly should not be the sole criterion, neither should school districts operate as "if given access to unlimited funds." *See id.* Thus, the Fourth Circuit concluded in the case before it that the school district complied with the IDEA by providing a deaf student with a "cued speech" program in a high school that was 5 miles farther away than the student's local high school. The Fourth Circuit found it sufficient that the school district established a centralized "cued speech" program for 78 deaf students in one high school because creation of such a resource-intensive program in each of the students' base schools would place too great a strain on finite resources. *See id.* at 153–54.

Courts of appeals in other circuits have reached similar conclusions. *See, e.g., Flour Bluff Independent Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693–95 (5th Cir.1996) (approving placement in a school 17 miles away from the child's home, 8 miles farther from her base school, in light of scarce educational resources and limited financial means), *petition for cert. filed*, 65 U.S.L.W. 3416 (U.S. Nov. 25, 1996) (No. 96–826); *Poolaw ex rel. Poolaw v. Bishop*, 67 F.3d 830, 837 (9th Cir.1995) (approving placement of a deaf child in a school located 280 miles away from the child's home because it was the closest school available that provided the intensive instruction in American Sign Language required by the child's IEP); *Murray v. Montrose County Sch. Dist. RE–1J*, 51 F.3d 921, 928–29 (10th Cir.) (concluding that the regulations create "at most a preference for education in the neighborhood school" and approving placement in a school ten miles away from the child's neighborhood school), *cert. denied*, —— U.S. ——, 116 S.Ct. 278, 133 L.Ed.2d 198 (1995); *Schuldt ex rel. Schuldt v. Mankato Independent Sch. Dist. No. 77*, 937 F.2d 1357, 1361–63 (8th Cir.1991) (approving placement in a non-neighborhood school rather than requiring physical modification of the neighborhood school to accommodate the child's disability), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992).

To provide the Life Skills Support program within the Cheltenham school district, Cheltenham would have to construct a new classroom at considerable expense and hire a new teacher as well as possibly a new teacher's aide. Furthermore, Cheltenham would have difficulty duplicating the quality of the existing Billet IU program and its related services, given the greater resources, experience, and expertise that the MCIU can provide. Moreover, it is possible that Joel would be the only student, or at best one of two students, in a Life Skills Support program conducted at Wyncote Elementary School, whereas he would be one of twelve students if placed in the Billet IU program. Finally, the Billet IU program is the closest existing Life Skills Support program available to Joel and is located only ten miles away. Given these considerations, placing

Joel in the existing Life Skills Support program at Crooked Billet Elementary School is an appropriate placement under the IDEA and its accompanying regulations, and Cheltenham is therefore not required to create the Life Skills Support program within its own district. An order will be entered accordingly.

### ORDER

AND NOW, this 24th day of December, 1996, IT IS ORDERED that:

(1) the Order of the Special Education Due Process Appeals Review Panel of April 28, 1996 is vacated insofar as it ordered the Cheltenham School District to provide the Life Skills Support program within its own school district;

(2) the Order of Special Education Hearing Officer Vernard M.W. Trent of March 10, 1996 is reinstated insofar as it permitted placement of Joel in the Life Skills Support program operated by the Montgomery County Intermediate Unit; and

(3) the decision of the Special Education Due Process Appeals Review Panel of April 28, 1996 is affirmed in all other respects.