Jose A. **LEBRON, et al., Plaintiffs,**

v.

**NORTH PENN SCHOOL DISTRICT, Defendant.**

**Civil Action No. 09–5494.**

United States District Court, E.D. Pennsylvania.

Feb. 14, 2011.

in the court's memorandum opinion in Civ. No. 08–330.

Robert B. Gidding, Law Offices of Robert B. Gidding, Bala Cynwyd, PA, for Plaintiffs.

Kyle J. Somers, Dischell Bartle Yanoff, Lansdale, PA, for Defendant.

## MEMORANDUM

ANITA B. BRODY, District Judge.

This dispute involves plaintiff parents' objections to a defendant school district's educational plan for their autistic son. Plaintiffs claim that the school district's proposed kindergarten plan violated the Individuals with Disabilities Education Act ("IDEA" or "the Act").

## I. BACKGROUND

IDEA's predecessor statute was enacted in response to a congressional finding that a majority of children with disabilities did not receive appropriate educational services. *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1213 (3d Cir. 1993); *see* 20 U.S.C. § 1400(c)(2). Today, IDEA authorizes federal grants to states on the condition that they provide appropriate education to children with disabilities and that they do so in accordance with the Act. 20 U.S.C. § 1411. The Act describes how states should evaluate eligible children's educational needs and develop individualized educational plans ("IEPs"). 20 U.S.C. §§ 1412–1414. An IEP is a written document that is tailored for a particular child's unique needs. 20 U.S.C. § 1414(d). It describes the child's present abilities and challenges, sets measurable goals and methods to measure the child's progress towards those goals, and prescribes services and modifications for the child. *Id.;* 34 C.F.R. § 300.320(a); *see* 22 Pa.Code § 14.102(a)(2)(xxvii) (incorporating 34 C.F.R. § 300.320 by reference).

Plaintiffs bring this action on behalf of P.L., a seven-year-old boy who resides in North Penn School District ("District").[1] Pa. Special Educ. Hearing Officer Order, No. 00004–0910LS (Aug. 24, 2009), R. Ex. 2, at 3, ¶ 1 [hereinafter Decision]. When P.L. was almost three years old, P.L. was diagnosed with a developmental disorder, *id.* ¶ 4; he was later identified as autistic with a speech and language impairment, *id.* ¶ 2. For the 2008–2009 school year, P.L. attended a private pre-kindergarten program for two-and-a-half hours per weekday in a class of typical peers. *Id.* ¶ 6. In addition, he received services including weekly speech and language therapy, occupational therapy, monthly teacher support, a weekly social skills group, and weekly behavior support and socialization training. *Id.* at 4, ¶ 7.

The Defendant District became responsible for providing P.L. with special education services beginning in kindergarten, the 2009–2010 school year. *Id.* at 3, ¶ 1. In preparation, P.L. was evaluated and observed in order to design an appropriate IEP. *Id.* ¶ 10. On May 11, 2009, an IEP meeting was held to discuss P.L.'s IEP for the upcoming kindergarten year. R. at Ex. 4, P–1 at 3. On May 22, 2009, the District formally recommended an IEP to P.L.'s parents ("Parents") that provided for P.L. to attend a regular education kindergarten program with supplemental special education services. R. at Ex. 4, P–7. The Parents did not agree with the recommended supplemental services. R. at Ex. 4, P–8 at 5. An informal meeting was held to discuss their concerns. R. at Ex. 4, P–1 at 3; R. at Ex., 4, P–12 at 1.

---

**1.** The minor plaintiff is referred to by his initials to protect his identity.

Though the District and the Parents ultimately agreed on P.L.'s needs and the types of services that the District recommended,[2] the parties could not agree on the amount and location of his supplemental services. The District recommended that P.L. spend all fifteen hours a week of a regular education kindergarten program and that he also attend an additional fifteen hours a week in a support class for similar students with high-functioning autism. R. at Ex. 4, P–11 at 2, 4. Because the support class was not currently available for kindergartners at P.L.'s neighborhood school, the IEP was to be implemented at nearby Montgomery Elementary School. R. at Ex. 4, P–15 at 2, 5. The Parents agreed with the recommendation that P.L. attend a regular education classroom, but they objected to sending P.L. to a different school and to an additional class composed entirely of students with similar needs. R. at Ex. 4, P–8 at 5; R. at Ex. 4, P–11, at 3. Instead of a daily support class, they preferred that P.L. receive itinerant services and that his program be implemented at his neighborhood school. R. at Ex. 4, P–1 at 4.

On July 1, 2009, the Parents requested an expedited due process hearing pursuant to 20 U.S.C. § 1415(f) to challenge the District's kindergarten IEP. R. at Ex. 4, P–1. On August 5, 2009, the parties appeared before an impartial Pennsylvania Special Education Hearing Officer ("Hearing Officer") to resolve their dispute. The Parents argued that the proposed IEP did not provide P.L. with an education in the least restrictive environment. They wanted P.L. to attend a regular education class at his neighborhood school and be provided with: a one-to-one aide present in the class to assist him, speech and language services sessions in the classroom, as well as after-hours services with speech and language therapists. *See* R. at Ex. 4, P–1 at 3–4. The District argued that it had considered the program that the Parents suggested, but concluded that ad hoc services would not provide P.L. with an appropriate education for his needs. *See, e.g.,* R. at Ex. 3, Tr. 30:3–34:7; R. at Ex. 4, P–7 at 1; R. at Ex. 4, P–8 at 2. It explained that the supplemental autistic class would better educate P.L. and that such a class could not currently be provided for kindergartners at his neighborhood school. R. at Ex. 4, P–7 at 34; R. at Ex. 4, P–15 at 5.

On August 24, 2009, the Hearing Officer issued a decision in favor of the District.[3]

---

2. P.L.'s needs include "specific and explicit instruction in pragmatic language and social skills, including the opportunity to practice the skills he learns; ... occupational therapy for sensory regulation, organization, motor planning, attention and responding to directions; ... [and] continuation of a 1:1 aide to facilitate generalization and use of skills in the regular education environment and to support appropriate behavior in that setting." Decision 4, ¶ 9. The types of services that the District recommended included "[s]peech/language services directed toward explicit instruction in pragmatic language, social skills and appropriate classroom behavior, based upon [P.L.]'s specific needs; ... group [occupational therapy] services directed toward appropriate school-related skill such as taking turns, transitioning to different

activities, controlling body movements, sitting appropriately, responding appropriately to directions/requests and dealing appropriately with frustrations such as losing at a game, having to wait and making mistakes[;] ... [occupational therapy] services directed toward improving [P.L.]'s handwriting skills in terms of both copying and proper spacing of words, motor planning/use of classroom materials and developing the ability to restate the steps to completing an activity or project." *Id.* at 4–5, ¶ 10.

3. The Officer did, however, order the District to collect data on P.L.'s progress and to reconvene an IEP team halfway through the *school year to consider whether the education* plan remained appropriate. Neither party re-

Decision 17. She found that the Parents did not meet their burden of showing the District's proposed IEP was inappropriate. She rejected the Parents' least restrictive environment argument because the District's plan did not seek to remove P.L. from any part of the regular education instruction. On November 18, 2009, the Parents filed suit in this Court to challenge the Hearing Officer's conclusions, pursuant to 20 U.S.C. § 1415(i)(2)(A). The Parents ask that this Court vacate the administrative order, issue a declaratory judgment that the District's IEP violated IDEA, and reimburse them for attorney fees and costs.[4]

## II. LEGAL STANDARD

 In an IDEA action, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). District courts employ a "modified *de novo*" review of the administrative proceedings. *S.H. v. State–Operated Sch. Dist. of Newark,* 336 F.3d 260, 270 (3d Cir.2003). The administrative agency's factual findings are given "due weight." *Shore Regional High Sch. Bd. of Educ. v. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004). A reviewing court defers to those factual findings unless the court "can point to contrary non-testimonial extrinsic evidence on the record." *S.H.,* 336 F.3d at 270; *Carlisle Area Sch. v. Scott P. by & Through Bess P.,* 62 F.3d 520 (3d Cir. 1995). While this standard is not as deferential as that used to review other agency actions, courts are not free to "substitute their own notions of sound education policy for those of the educational agencies they review." *Susan N. v. Wilson Sch. Dist.,* 70 F.3d 751, 757 (3d Cir.1995) (citing *Bd. of Educ. v. Rowley,* 458 U.S. 176, 205–06, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)).

## III. DISCUSSION

There are a number of motions and briefs before me. Both parties move for summary judgment. ECF Nos. 29, 41, 45 (Defendant's motion and related briefing); 31, 42, 43 (Plaintiffs' summary judgment brief[5] and related briefing). The Defendant also moves to strike Plaintiffs' motion for summary judgment and the evidence attached thereto, ECF No. 36, and Plaintiffs respond with a cross-motion to admit

---

quests review of this part of the Decision and thus I will not address it.

**4.** The claim for injunctive relief for the 2009–2010 year is now moot as the school year has concluded. Any remaining request for injunctive relief was withdrawn when the parties failed to notify the Court of a live controversy regarding P.L.'s current placement. *See* Telephone Conference Tr. 12:16–13:8, May 25, 2010 (ordering a July 2010 deadline to notify the Court of any dispute regarding the 2010–2011 IEP); Order, May 25, 2010, ECF No. 24 (same). The request for private school tuition reimbursement has been withdrawn. Telephone Conference Tr. 3:15–4:5, 16:22–17:3, May 25, 2010. Though the only remaining request for relief on the merits is for a declaratory judgment, neither party has argued the case should be dismissed as moot.

The parties vigorously debate the District's continuing legal obligations to P.L. under IDEA and the Parents intend to pursue these same arguments again, each year, regarding the District's legal obligations to P.L. Pls.' Aff. ¶¶ 14–16; *see Sacramento City Unified Sch. Dist. v. Rachel H.,* 14 F.3d 1398, 1403 (9th Cir.1994) (finding live controversy where parties "have conflicting educational philosophies and perceptions of the District's mainstreaming obligation"); *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1040 (5th Cir. 1989) (finding dispute not moot where each side "steadfastly adheres to its perception of the [law's] mainstreaming requirement").

**5.** Plaintiffs did not electronically file their motion for summary judgment; their supporting brief is at ECF No. 31.

additional evidence, ECF No. 40; *see also* ECF Nos. 44, 46 (related briefings). Collectively, these filings present the following questions: (a) should Plaintiffs' additional evidence be admitted; (b) was the Hearing Officer correct in finding that the IEP did not violate IDEA; and (c) are Plaintiffs statutorily eligible for attorney fees?

### A. Review of Additional Evidence

Plaintiffs ask the Court to admit three pieces of additional evidence: (1) an expert report by Educational Consultant Marie Lewis; (2) a report signed by behavioral analyst Tim Nipe; and (3) P.L.'s progress report for his kindergarten year at a private school.[6] Pls.' Cross–Motion 1–2, ECF No. 40. This evidence was not offered to the Hearing Officer before she issued her decision. Defendant moves to strike these submissions on a number of grounds—from procedural improprieties to irrelevance.

 IDEA allows parties to proffer evidence outside of the administrative record to a district court. 20 U.S.C. § 1415(i)(2)(C)(ii). After reviewing the evidence, however, it is within the discretion of the court to decide to exclude it. *Susan N.*, 70 F.3d at 760. Courts have rejected a bright-line rule as to when evidence should be excluded. *Id.* (citing *Town of Burlington v. Dep't of Educ. for Mass.*, 736 F.2d 773, 790–91 (1st Cir.1984)). Rather, courts review proffered evidence to determine whether it is "relevant, non-cumulative and useful in determining whether Congress's

goal has been reached for the child involved." *Susan N.*, 70 F.3d at 760. After-acquired evidence about how a child actually fared subsequent to an school district's action "may be considered only with respect to the *reasonableness* of the district's decision at the time it was made." *Susan N.*, 70 F.3d at 762. This type of evidence should be used quite cautiously to ensure that a court does not second-guess "a school district with information to which it could not possibly have had access at the time it made those decisions ...." *Id.*

### 1. The Lewis Report

 The Parents urge the Court to consider an expert report prepared on May 4, 2010 by Educational Consultant Marie Lewis, Ph.D. ("Lewis Report"). The report primarily offers an analysis of the Hearing Officer's weighing of evidence. *E.g.*, Lewis Report 3 (claiming that the Hearing Officer did not "give adequate weight" to two of Plaintiffs' exhibits); 6 (speculating that "administrative convenience was a determining factor"). Plaintiffs attempt to persuade this Court to rely on her report by analogizing it to a judge who uses "her own expert to evaluate the defendant" for a criminal sentencing. Pls.' Cross–Motion 15 n. 2, ECF No. 40. This analogy is inapt because Lewis's report evaluates the Hearing Officer's abilities—not P.L.'s. While courts sometimes accept expert evaluations of a student in IDEA actions, these evaluations should not present legal analysis. *See Moorestown Twp. Bd. of Educ. v. S.D.*, 2010 WL 4062182, at

---

**6.** Defendant argues the evidence should be struck because Plaintiffs did not move for the admission of additional evidence earlier. Def.'s Br. Supp. Mot. to Strike 5, ECF No. 36–1. However, the Parents first requested leave to present additional evidence to the Court in their Complaint. Compl. ¶ 32, ECF No. 1. While this Court's March 29, 2010 Scheduling Order may have invited Plaintiffs to file a distinct motion on the issue, the

Order cannot reasonably be interpreted to have imposed a March 26, 2010 deadline on the filing of such motion. *See* ECF No. 24. The District has had sufficient notice throughout this action that Plaintiffs wished to submit additional evidence. *See Susan N.*, 70 F.3d at 755 n. 6 (rejecting district's claim that parents had not adequately made known their wish to submit additional evidence).

*4–5, 2010 U.S. Dist. LEXIS 109856, at *12–13 (D.N.J. Oct. 15, 2010) (rejecting proffered expert evidence in IDEA action insofar as the testimony constituted legal analysis). One's opinion about whether an administrative hearing officer complied with the law is not a proper subject for an expert evaluation. Lewis's criticisms would have been more suitably submitted to an attorney to use to formulate *arguments* to the Court—they will not be admitted as *evidence.*

To the extent that the Lewis Report contains some opinions that are within the capacity of an educational expert to offer, the author does not explain her basis for arriving at these conclusions sufficiently for me to accord them with any weight. *E.g.,* Lewis Report 4, 7–9 (recommending educational services for P.L. without identifying a methodology or any personal interaction with P.L. upon which her recommendations are based). The probative value of the Lewis Report is also undermined by the mistaken belief that the recommended autistic support class was to replace, rather than supplement, instruc-

tion in a regular education classroom for P.L. Lewis Report 11 ("The use of a 1:1 Aide was used as a reason for placing [P.L.] in a more restrictive setting and defining him as having a disability that was so severe as to not allow him to participate in a regular education setting . . . . A full range of supplemental aides in regular education are regularly available . . . to avoid taking a child out of the regular education and placing them, [sic] in more restrictive environments, [sic] like an Autistic Support class."). The parties agree that P.L. was not to be removed from any part of the regular education kindergarten class; their only dispute revolves around his supplemental special education services. For these reasons, the opinions in the Lewis Report are not useful.

In sum, Plaintiffs have not met their burden of persuasion and I will decline to admit the Lewis Report as additional evidence.[7]

## 2. The Progress Report

■ The 2009–2010 Progress Report ("Progress Report") is offered to show that, after the hearing, P.L. made "prog-

---

7. Furthermore, even if the Lewis Report were substantively admissible, case law suggests that Plaintiffs must also present a sufficient justification for not offering this evidence at the initial administrative hearing. Plaintiffs fail to do so here. Plaintiffs claim that the Lewis Report could not have been offered to the Hearing Officer because it responds to the District's Garcia–Winner methodology, which the District discussed for the first time at the due process hearing. Pls.' Cross-Motion 14. Plaintiffs do not explain why it is fair or necessary for this Court to hear criticism of the Garcia–Winner methodology when they did not appear to believe it was necessary for the Hearing Officer to be privy to the same information. I find nothing in the record to show that Plaintiffs requested to continue the hearing or that they otherwise asked the Hearing Officer for the opportunity to debunk the District's testimony regarding its methodology. *Cf. D.K. v. Abington Sch. Dist.,* 2010 WL 1223596, at *10, 2010 U.S. Dist. LEXIS

29216, at *35 (Mar. 25, 2010) (declining to admit expert report and noting plaintiffs' failure to request a continuance of the due process hearing).

If district courts are to give due weight to the educational expertise of administrative proceedings, then presumably they must be cautious about allowing a party to initiate an educational-research debate after an administrative determination. To freely admit evidence in the absence of a persuasive justification would vitiate congressional intent that courts defer to the educational expertise of the agency—it would reduce the administrative proceedings "to a mere dress rehearsal." *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 997 (1st Cir.1990); *see Springer v. Fairfax County Sch. Bd.,* 134 F.3d 659, 667 (4th Cir.1998) (quoting same). I need not decide, however, whether admitting the Lewis Report is procedurally appropriate here because, as explained above, the evidence should also be excluded on substantive grounds.

ress" in kindergarten despite not attending an autistic support class like the District recommended. Pls.' Cross–Motion 16–17. The Progress Report is based on events that took place after the District developed the IEP at issue in this action, and after the close of the administrative proceedings.

The Progress Report is clearly information to which the District "could not possibly have had access at the time" it recommended the disputed IEP. *Susan N.*, 70 F.3d at 762. Its relevance is thus limited to assessing the reasonableness of the District's original decision; however, it is not clear how the Progress Report could be useful to that inquiry. First, it is questionable whether the Progress Report supports finding that P.L. adequately progressed at the private school program. In it, his teachers detail significant social and emotional problems and his grades do not obviously illustrate achievement. Second, even assuming that the Progress Report could be interpreted to show that P.L. excelled, I do not have enough information about P.L.'s educational program at the private school to be able to draw any inferences from that success. Plaintiffs refer to P.L. being in a regular education classroom, but they do not offer any evidence that demonstrates what supplemental services P.L. actually received during kindergarten. Without this information, I cannot draw conclusions about P.L.'s actual service needs for kindergarten, and so I certainly am unable to draw inferences about whether the Progress Report shows that the IEP was an unreasonable forecast.

Plaintiffs have failed to meet their burden to show that the Progress Report is useful to the relevant inquiry, and I will therefore exclude it.[8]

### 3. The Nipe Report [9]

 The Nipe Report is offered to add "to evidence presented . . . during the administrative hearing" regarding P.L.'s progress in pre-kindergarten and, like the Progress Report, is offered to show that after the hearing P.L. made "progress" in kindergarten despite not attending an autistic support class. Pls.' Cross–Motion 16–18. The author is a behavioral analyst who has worked with P.L. for years. Nipe Report ¶¶ 1, 6.

The brief portion of the Nipe Report that is related to pre-kindergarten is cumulative in light of the evidence already in the record, and thus that portion will be excluded. The remainder of the report presents the same problems as the Progress Report and thus will also be excluded. *See, e.g.,* Nipe Report ¶¶ 12–14 (graphing P.L.'s task compliance during a two-month period in the kindergarten year without identifying the type or amount of services that P.L. received during that period).

### B. IEP Compliance with IDEA

Plaintiffs make three substantive arguments that the IEP violates IDEA: (1) its supplemental services are substantively inappropriate, (2) it violates the Act's least restrictive environment ("LRE") requirement, and (3) it violates federal regulations that favor sending children to their neighborhood schools. The Hearing Officer heard and rejected all of these arguments.[10]

---

8. In addition to these substantive justifications for rejecting the Progress Report, it may also be excludable to prevent prejudice to the Defendant. *See Jaffess v. Council Rock Sch. Dist.*, 2006 WL 3097939, at *3–4, 2006 U.S. Dist. LEXIS 78887, at *10 (Oct. 27, 2006) (declining to consider evidence of a child's post-hearing academic success in part because of prejudice to the school district).

9. Though the Nipe Report is titled "Affidavit," I refer to it as a report because the statements do not appear to have been sworn to before an officer authorized to administer oaths.

10. Defendant suggests that Plaintiffs only present LRE claims to this Court. Def.'s Br. Supp. Mot. Summ. J. 7 n. 4, ECF No. 29–1. Defendant fails to cite anywhere in the record

### 1. Appropriateness of the IEP

The Parents argue that the District's proposed placement in an autistic support class is inappropriate. Compl. ¶ 31; Pls.' Br. Supp. Summ. J. 5, 9–16. To determine whether the District's recommended services substantively satisfy IDEA, I consider whether the IEP provides P.L. with an appropriate education.

■ A central goal of IDEA is that every child receive a free appropriate public education ("FAPE"). 20 U.S.C. § 1400(d)(1)(A). Courts measure whether the FAPE requirement is met by assessing whether a child's IEP is " 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.' " *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir.2004) (quoting *Polk v. Cent. Susquehanna Interm. Unit 16*, 853 F.2d 171, 181 (3d Cir.1988)); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 189, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). To be satisfactory, an "IEP must provide 'significant learning' and confer 'meaningful benefit.' " *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir.2000) (quoting *Polk*, 853 F.2d at 182, 184).

■ At the administrative hearing, the Hearing Officer recognized that the burden of proof lies with the party challenging the IEP—in this case, the Parents. *See* Decision 16 (concluding that the "Parents have not borne their ultimate burden of proving that" the IEP was inappropriate); *Schaffer v. Weast*, 546 U.S. 49, 59, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005) (holding that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief");

where Plaintiffs conceded the appropriateness of the IEP. While Plaintiffs' criticisms have been primarily framed as LRE arguments, the Complaint and summary judgment brief also argue that the autistic support class is inappropriate.

*L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 392 (3d Cir.2006) (finding the *Schaffer* holding is not limited to its facts in that it applies to the appropriateness of an IEP as a whole).

### i. Factual Findings [11]

The IEP provided that P.L. attend a kindergarten autistic support class during the morning of each school day, and the regular education kindergarten program in the afternoons. Decision 5, ¶ 11. In the mornings, P.L. was to receive speech and language services directed toward explicit instruction in pragmatic language, social skills, and appropriate classroom behavior; group occupational therapy services directed toward appropriate school-related skills such as taking turns, transitioning to different activities, controlling body movements, sitting appropriately, responding appropriately to directions and dealing appropriately with frustrations such as losing at a game, having to wait, and making mistakes; and occupational therapy services directed toward improving P.L.'s handwriting skills in terms of both copying and proper spacing of words, motor planning, use of classroom materials, and developing the ability to restate the steps to completing an activity or project. *Id.* at 4–5, ¶ 10. In the afternoons, P.L. was to attend the regular kindergarten class of his nondisabled peers, in which he could practice skills taught in the autistic support class. *Id.* at 5, ¶ 11. His IEP provided a "tiered" approach to explicitly teach him skills in the morning and then help him transfer those skills to the regular education setting in the afternoon. *Id.* at 5, ¶¶ 11–12.

**11.** Having reviewed the record in its entirety, I find that the following factual findings are supported by a preponderance of the evidence.

The District operates several levels of the autistic support class for kindergartners, depending on the severity and type of the child's disability. *Id.* at 5, ¶ 13. P.L. was to be placed with similarly high-functioning students. *Id.* The goal of this autistic support class is to place the students entirely in a regular education class as soon as possible. *Id.* at 5, ¶ 15. While autistic support classes were available at his neighborhood elementary school for older children, at that time the school did not have a kindergartner support class and the IEP was to be implemented at nearby Montgomery Elementary School. R. at Ex. 4, P–15 at 5.[12] If P.L.'s progress continued as it did before kindergarten, the District thought it possible that P.L. would be able to enroll in the regular education first grade in his neighborhood school and receive support entirely in the regular education classroom. Decision 5, ¶ 15.

### ii. The Hearing Officer's FAPE Determination

The Hearing Officer heard testimony and admitted evidence from both parties to assess whether P.L.'s IEP was appropriate. She concluded that the "Parents did not overcome the District's proof that [P.L.] should also receive services in an autistic support class and participate in regular kindergarten in the same building . . . ." Decision 11. She credited the District's extensive evidence concerning its analysis of P.L.'s individual needs, the District's evidence concerning the advantages of the tiered approach, and the District's credible testimony concerning its commitment to reassign P.L. to his neighborhood school as soon as he is able to make meaningful progress in the settings available there. *Id.* at 10–11.

The Hearing Officer also explained why the Parents' evidence ultimately did not

persuade her that the IEP was inappropriate. The Parents presented data about P.L.'s progress in his preschool placement, yet they failed to present any evidence that this placement was similar to the District's regular education kindergarten program. *Id.* at 13. The Parents presented a letter from a Widener University neuropsychologist who concluded that P.L. did not need an autistic support class room. The Hearing Officer gave this evidence little weight because the author's only knowledge of P.L. appeared to be based upon a report not offered into evidence and it was unclear whether the author understood the specific autistic support program that was provided in the IEP. *Id.* at 14. The Parents also submitted a letter from P.L.'s preschool program director, but the Officer found this letter to provide little "support for the Parents' position, since it paints a fairly detailed picture of still-significant needs that must be addressed in order for [P.L.] to succeed in a typical classroom . . . ." *Id.* at 14–15.

### iii. The Record Supports the Hearing Officer's FAPE Determination

▇ The Hearing Officer's conclusions about FAPE were sound and supported by proper evidence. As the Hearing Officer deftly explained, the record provides ample support to find that the IEP provided P.L. with a meaningful benefit. I defer to the Hearing Officer's credibility determinations because I do not find support in the record for a contrary conclusion. The Hearing Officer's weighing of the evidence was also entirely reasonable. The Parents have not submitted evidence to this Court that addresses the evidentiary gaps identified by the Hearing Officer. In light of the adopted factual findings, the evidence supports a conclusion that the IEP satisfies FAPE.

---

**12.** This fact was not included in the Hearing Officer's factual findings; it appears to be undisputed and is included here to provide background information.

## 2. Least Restrictive Environment Requirement

The Plaintiffs' primary argument is that the IEP violates the Act's mainstreaming requirement. Pls.' Br. Supp. Summ. J. 5–6, 21–25. Defendants argue that the evidence supports the Hearing Officer's decision rejecting this claim. Def.'s Br. Supp. Summ. J. 6–12.

IDEA also seeks to ensure that disabled students are educated in the least restrictive environment ("LRE"). In passing IDEA and its related legislation, Congress was concerned that children with disabilities were educationally segregated from their nondisabled peers. The Act thus incorporates a "mainstreaming" component, which is referred to as the LRE requirement:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). Together, FAPE and LRE require that "a child be placed in the least restrictive environment . . . that will provide him with a meaningful educational benefit." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir.2000).

At times, the statutory presumption that children should be taught with their nondisabled peers can seem in tension with IDEA's goal of providing an appropriate program for a child's unique needs. *Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1214 (3d Cir.1993); *P. v. Newington Bd. of Educ.*, 546 F.3d 111 (2d Cir.2008). In *Oberti*, the Third Circuit observed that the "key to resolving this tension appears to lie in the school's proper use of 'supplemental aids and services' . . . which may enable the school to educate a child with disabilities for a majority of the time within a regular classroom, while at the same time addressing that child's unique educational needs." 995 F.2d at 1214. While acknowledging that IDEA leaves educational policy decisions to local officials, the court adopted a two-part test for courts to assess compliance with the statutory LRE requirement. First, a court must determine "'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Id.* at 1215 (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). Second, if "placement outside of a regular education is necessary for the child's educational benefit, it must evaluate 'whether the school has mainstreamed the child to the maximum extent appropriate . . . .'" *T.R.*, 205 F.3d at 578 (quoting *Oberti*, 995 F.2d at 1215).

The record quickly reveals that a least restrictive environment analysis is irrelevant to this case. Both parties agreed that P.L. would attend the full instructional program of regular education kindergarten. The Parents argued to the Hearing Officer, and again argue here, that the "least restrictive" standard ought also to apply to assess the appropriateness of P.L.'s supplemental services. This argument extends the scope of the LRE mandate in a way that is not supported by the statute or case law. The statutory and regulatory language reflects congressional concern with "removal" from classes with nondisabled peers. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2). P.L. has not been removed from any part of class with nondisabled peers—he was to attend the full fifteen hours. Courts' in-

quiry into the LRE requirement ceases when a child is fully included in a regular class, as P.L. was to have been. *See T.R.,* 205 F.3d at 578; *see also Oberti,* 995 F.2d at 1215 n. 21 (noting that a child may, of course, receive special education and services outside of the regular classroom). By definition, P.L. has been mainstreamed to the "maximum extent" possible because there is no additional regular class time into which he could be incorporated. 20 U.S.C. § 1412(a)(5)(A).

Plaintiffs' arguments are strikingly similar to those emphatically rejected by the Sixth Circuit Court of Appeals in *McLaughlin v. Holt Public Schools Board of Education,* 320 F.3d 663 (6th Cir.2003). *McLaughlin* also involved an agreement that the kindergartner at issue would attend the full half-day regular education program, a dispute about the type of special education program provided for the child in the other half of the day, and a complaint that the IEP would not be implemented at the child's neighborhood school. As the *McLaughlin* court adeptly explained, "the issue of least restrictive environment was not relevant because the parties had agreed about the extent to which [the child] would be in a general education classroom. The least restrictive environment analysis is relevant when there is a question of mainstreaming . . . ." *Id.* at 671. I similarly find that an LRE analysis is inapplicable to the instant case—when a child is fully mainstreamed as P.L. was to be, FAPE provides the relevant rubric to measure the appropriateness of his or her supplemental services.[13]

### 3. School Location

■ The Plaintiffs also argue that federal regulations require the District to educate P.L. at his neighborhood school. Pls.' Br. Supp. Summ. J. 5, 6–8. They argue that the Hearing Officer incorrectly used a "reasonableness" standard of review of the school location for P.L.'s IEP, when she should have decided whether his disability "required" placement at a nonneighborhood school. *Id.* at 8–9.

IDEA's implementing regulations state that "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled" and generally the placement should be "as close as possible to the child's home." 34 C.F.R. § 300.116(c), (b)(3). As other courts have observed about identical iterations of the regulatory language, "their qualifying language is critical." *White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 380 (5th Cir.2003). The Third Circuit has noted that a child would ideally attend the same school that the child would have attended if she were not disabled—but that placement is only appropriate "to the extent that it 'satisfactorily educates' the disabled child." *S.H. v. State–Operated Sch. Dist.,* 336 F.3d 260, 272 (3d Cir.2003) (quoting *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 535 (3d Cir.1995)). In a previous unrelated opinion, I explained how IDEA and its implementing regulations relate to the issue of school location:

> Although the regulations do signal a preference that the child be located in the school he would attend if nondisabled, they explicitly contemplate that the child's IEP may require "some other

---

13. Although the Hearing Officer appeared to recognize this point, perhaps out of an abundance of caution she continued to analyze the parties' LRE arguments. As LRE is irrelevant, I do not adopt the Hearing Officer's comparative LRE analysis between the IEP and the Parents' suggested services. Furthermore, I need not review or adopt any factual findings regarding what the Parents' suggested alternative services were.

arrangement," and rather than mandating placement in the child's neighborhood school, they require only that the child be placed as close "as possible" to the child's home .... [T]he regulations and commentary identify geographical proximity as a consideration, but not a mandatory requirement, in placing a disabled child.

*Cheltenham Sch. Dist. v. Joel P.*, 949 F.Supp. 346, 351–52 (E.D.Pa.1996), *aff'd* 135 F.3d 763 (3d Cir.1997). While the statute has been amended and the regulations reordered since my previous observations on this matter, the governing principles remain the same. Geographical proximity is a factor that districts must consider, but they have "significant authority to select the school site, as long as it is educationally appropriate." *White*, 343 F.3d at 382; *see A.W. v. Fairfax County Sch. Bd.*, 372 F.3d 674 (4th Cir. 2004); *McLaughlin*, 320 F.3d at 672 (6th Cir.2003); *see also T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 420 (2d Cir.2009) (finding that an IEP need not specify the school location); Letter from Patricia J. Guard, Acting Dir., Office of Special Educ. Programs, to Tom Trigg, Chapman Mgmt. Grp., (Nov. 30, 2007), *available at* http://www2.ed.gov/policy/speced/guid/idea/letters/revpolicy/tplre.html (advising that "[i]f a child's IEP requires services that are not available at the school closest to the child's home, the child may be placed in another school that can offer the services that are included in the IEP and necessary for the child to receive a free appropriate public education"). In sum, though educational agencies should consider implementing a child's IEP at his or her neighborhood school when possible, IDEA does not create a right for a child to be educated there.

The record shows that the District fulfilled its legal obligations by considering placing P.L. at his neighborhood school before deciding to implement his IEP elsewhere.[14] The Parents and District representatives exchanged e-mails in March 2009 discussing whether P.L.'s neighborhood school would have an appropriate autistic support class. R. at Ex. 4, P–15 at 2–12. One such e-mail informed the Parents that there would be three autism support classes at their neighborhood school for the upcoming school year, however, they were all aimed at intermediate grades and thus could not adequately support P.L.'s needs. R. at Ex. 4, P–15 at 5. The Parents do not submit evidence to dispute the District's representations. In sum, the record supports finding that the District fulfilled its obligations to consider implementing P.L.'s IEP at his neighborhood school.

### C. Attorney Fees

Having rejected Plaintiffs' request for a declaratory judgment, the only remaining request for relief is for attorney fees and costs.[15] Defendant argues that the Court can also deny this request because Plain-

---

**14.** The record also shows that the District considered different services that were available at P.L.'s neighborhood school. Both the May and June 2009 Notices of Recommended Educational Placement report that the IEP "team considered a half day kindergarten program with a modified day to provide related services beyond the kindergarten day with learning support services at Gwynedd Square which is [P.L.]'s neighborhood school." R. at Ex. 4, P–8 at 2, P–13 at 2. Both Notices explain that this option was rejected because it could not "provide for the type of programming required by [P.L.] in order to be successful within the general education environment." *Id.*

**15.** A formal petition for attorney fees has not been filed. However, Plaintiffs argue that irrespective of the Court's decision today, they are entitled to attorney fees. In the interest of efficiency, I will also dispose of those arguments today.

tiffs are not a "prevailing party" entitled to attorney fees. Def.'s Br. Supp. Mot. Summ. J. 12–13. Plaintiffs argue that they prevailed by privately agreeing to an IEP for P.L.'s first grade school year. Pls.' Br. Opp. Def.'s Mot. Summ. J. 8–11, ECF No. 41.

■■■■ IDEA gives courts discretion to award parents attorney fees if they are the "prevailing party." 20 U.S.C. § 1415(i)(3)(B). Plaintiffs maybe considered "prevailing" if "they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (quotation marks and citation omitted). "[A]t a minimum, … the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). While filing a lawsuit may be a catalyst for a defendant's voluntary change, that change is insufficient for the plaintiff to receive prevailing party status unless there has also been a "judicial imprimatur on the change." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) (emphasis omitted); *see John T. ex rel. Paul T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 555 (3d Cir.2003) (holding that *Buckhannon* principle applies to the IDEA fee-shifting provision). A stipulated settlement that is ordered by a court may satisfy this standard. *E.g., Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 165 (3d Cir.2002) (finding plaintiff eligible to receive attorney fees where court had ordered a favorable stipulated settlement containing mandatory language and signed by the judge rather than the parties); *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848 (3d Cir.2006) (finding plaintiff eligible

where administrative judge had ordered a favorable settlement containing mandatory language, was signed by the judge, and was enforceable under § 1983).

The Third Circuit has specifically addressed various changes in IDEA actions that benefited plaintiffs yet did not confer prevailing party status. In *J.O. v. Orange Township Board of Education*, an administrative officer had ordered that the student be reinstated at his school. 287 F.3d 267, 269 (3d Cir.2002). The order was pursuant to the stay-put provision of IDEA and it was meant to maintain the status quo during the course of proceedings. *Id.* at 272. The Third Circuit found that the order was not enough to render the plaintiff the "prevailing party" because it was not "derived from some determination on the merits." *Id.* at 274. In *John T. v. Delaware County Intermediate Unit*, the Third Circuit found that a plaintiff was not a "prevailing party" by virtue of his having obtained an acceptable IEP through private negotiations. 318 F.3d 545, 560 (3d Cir.2003). Though the plaintiff may have realized an objective of his litigation, the IEP was developed privately by the parties and "no court had endorsed the agreement with a 'judicial imprimatur.'" *Id.*

The instant plaintiffs claim they received judicially-sanctioned relief because, when they sought to amend their complaint to add a claim regarding P.L.'s first grade IEP, the Court issued a scheduling order and deadline to notify the Court whether a dispute existed. Pls.' Br. Opp. Def.'s Mot. Summ. J. 9–11. Plaintiffs assert that this "court thus asserted jurisdiction over the first grade" dispute and, due to this "supervision period," the parties agreed to an IEP that embodied all of the relief that Plaintiffs sought. *Id.* at 10.

Plaintiffs misrepresent the Court's actions. Rather, the Court denied Plaintiffs'

motion to amend the complaint, set a time line for the parties to privately resolve their dispute, and memorialized the parties' consent to raising "any complaints" to this Court if they later believed judicial intervention was necessary. Order, May 25, 2010, ECF No. 24. Apparently the parties privately resolved their dispute regarding first grade because no complaints regarding first grade were filed. As a threshold matter, then, I am unable to assess whether the privately agreed-to IEP achieves some of the benefit that Plaintiffs sought because I never entertained the merits of the first grade dispute.[16]

As Plaintiffs have not received any judicially sanctioned relief, their request for attorney fees will be denied.

## IV. CONCLUSION

Defendant's motion to strike will be denied. It will be denied insofar as it seeks to prevent Plaintiffs from offering any additional evidence and as it seeks to strike Plaintiffs' motion for summary judgment for attaching additional evidence. The remainder of the motion will be denied as moot because, after a review of Plaintiffs' proffered evidence, I decline to admit the submissions as additional evidence.

Plaintiffs' motion for summary judgment will be denied as their requests for a declaratory judgment and for attorney fees are without merit. Accordingly, Defendant's motion for summary judgment will be granted.

### ORDER

**AND NOW,** this 14th day of February 2011, for the reasons discussed in the accompanying memorandum, it is **OR-DERED** that:

- Plaintiffs' Motion in Limine to Admit Additional Evidence (ECF No. 40) is **DENIED;**

- Defendant's Motion to Strike Plaintiffs' Motion for Summary Judgment (ECF No. 36) is **DENIED;**

- Plaintiffs' Motion for Summary Judgment (*see* ECF No. 31) is **DENIED;**

- Defendant's Motion for Summary Judgment (ECF No. 29) is **GRANTED.**

---

**16.** Even assuming *arguendo* that the first grade IEP gave Plaintiffs sought-after relief, that IEP has not been endorsed by a court. An application of relevant precedent unequivocally shows that the Plaintiffs are not entitled to an award of attorney fees. *See John. T.,* 318 F.3d at 560 (finding plaintiff was not "prevailing party" despite achieving a favorable but privately agreed-to IEP).